IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
       v.                       )       Criminal Action No.
                                )       06-06010-01-CR-SJ-SOW
TIMOTHY D. MORRISS,             )
                                )
            Defendant.          )

### REPORT AND RECOMMENDATION TO DENY
### DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Before the court is defendant's motion to suppress
statements on the grounds that police questioned defendant
without first contacting his attorney and without advising
him of his <u>Miranda</u> rights.  I find that defendant's Sixth
Amendment right to counsel had not attached at the time he
made his statement.  I further find that defendant was not
in custody at the time he was questioned and therefore law
enforcement was not required to advise defendant of his
<u>Miranda</u> rights.  Therefore, defendant's motion to suppress
his statement should be denied.

*I.  BACKGROUND*

On June 6, 2006, a three-count indictment was returned
charging defendant with one count of confining minors while
in interstate commerce, in violation of 18 U.S.C. § 1201(a),
one count of using an interstate facility to entice a minor

to engage in sexual activity, in violation of 18 U.S.C. §2422(b), and one count of interstate travel to engage in a sexual act with a minor, in violation of 18 U.S.C. § 2423(b).

Defendant filed the instant motion to suppress on October 2, 2006 (document number 29). The government filed a response to the motion on October 17, 2006 (document number 36).

On October 18, 2006, I held an evidentiary hearing on defendant's motion to suppress. The government appeared by Assistant United States Attorney Cynthia Phillips. The defendant was present, represented by Assistant United States Attorneys Anita Burns and Steve Moss. The government called Special Agent Kurt Lipanovich, Federal Bureau of Investigation, as a witness. Defendant Called David Wahlberg as a witness. In addition, the following exhibits were marked and admitted into evidence:

P. Ex. 1   Letter from AUSA Cynthia Phillips to David Wahlberg dated March 8, 2006

P. Ex. 2   Letter from AUSA Cynthia Phillips to David Wahlberg dated April 7, 2006

P. Ex. 3   Letter from David Wahlberg to AUSA Cynthia Phillips dated April 19, 2006

P. Ex. 4   FBI report of Special Agent Kurt Lipanovich dated April 28, 2006

2

D. Ex. 1    Letter to David Wahlberg from AUSA Cynthia
            Phillips dated March 7, 2006

D. Ex. 2    Letter from AUSA Cynthia Phillips to David
            Wahlberg dated March 8, 2006

D. Ex. 3    Letter to Special Agent Kurt Lipanovich from
            David Wahlberg dated March 15, 2006

D. Ex. 4    Letter from AUSA Cynthia Phillips to David
            Wahlberg dated April 7, 2006

D. Ex. 5    Letter from David Wahlberg to AUSA Cynthia
            Phillips dated April 19, 2006

D. Ex. 6    Letter from AUSA  Cynthia Phillips to David
            Wahlberg dated April 19, 2006

D. Ex. 7    FBI report of Special Agent Heidi Estrada
            dated March 10, 2006

## II.   *EVIDENCE*

On the basis of the evidence presented at the
suppression hearing, I submit the following findings of
fact:

1.    On July 31, 2005, allegations of sexual contact
with a minor were made against defendant to the Frisco
Police Department (Tr. at 25).  In December 2005, Special
Agent Lipanovich of the FBI became aware of the case (Tr. at
25).

2.    On March 2, 2006, the FBI obtained a search
warrant in Austin, Texas, for DNA, blood, and hair from
defendant (Tr. at 4).  Agents attempted to execute the

3

warrant on March 6, 2006, at the Austin State Hospital Gym
where defendant had wrestling practice, but defendant did
not show up that day (Tr. at 4-5).

3.     Criminal defense attorney David Wahlberg, who
practices in Austin, Texas, was retained by defendant
sometime in early March 2006 (Tr. at 49-50).  On March 7,
2006, Mr. Wahlberg received a letter from AUSA Cynthia
Phillips dated March 7, 2006, stating that defendant had
until noon that day to surrender to the FBI or an arrest
warrant would be issued (Tr. at 52, 60; D. Ex. 1).  Mr.
Wahlberg discussed the letter with defendant, and there were
some scheduling difficulties (Tr. at 52).  Therefore, Mr.
Wahlberg contacted either the US Attorney's Office or the
FBI to arrange for defendant to appear and give samples of
his hair, saliva, and blood (Tr. at 52, 61).  On March 8,
2006, Ms. Phillips sent a letter to Mr. Wahlberg agreeing to
an amended time of 11:00 a.m., March 9, 2006, for defendant
to meet with the FBI in Austin for execution of the search
warrant (Tr. at 5, 52, 61; D. Ex. 2).  The time was
subsequently changed to 11:00 a.m. on March 9 due to a
scheduling conflict with Mr. Wahlberg (Tr. at 61).

4.     Special Agent Lipanovich learned sometime between
March 6 and March 9 that defendant had a lawyer (Tr. at 27).

4

5. On March 9, 2006, defendant arrived at the FBI office with his attorney, Mr. Wahlberg (Tr. at 6, 53). Mr. Wahlberg was present to make sure nothing happened other than the collection of the samples indicated in the warrant, and specifically to make sure that defendant would not be questioned and that he did not volunteer any information (Tr. at 54, 69).

6. Defendant and Mr. Wahlberg arrived at the FBI office separately, but met outside and went in together (Tr. at 54). Special Agent Heidi Estrada introduced herself, explained the purpose of the search warrant, and explained how it would be conducted (Tr. at 6). Special Agent Estrada obtained the biographical information from Mr. Wahlberg and defendant (Tr. at 6). Then a hair sample and a buccal swab of the inside of defendant's mouth was taken at the FBI office (Tr. at 6). No other agents were involved in executing the search warrant (Tr. at 62).

7. Defendant and Mr. Wahlberg then drove in separate vehicles to a local medical facility where a vial of blood was drawn (Tr. at 6).

8. At no time on that day did Special Agent Estrada attempt to interview defendant (Tr. at 6-7, 29, 55, 62). Special Agent Estrada had been specifically instructed not

to interview defendant because he was represented by an attorney (Tr. at 7, 28-29, 73-74). Defendant was not advised of his <u>Miranda</u> rights because he was not being questioned (Tr. at 7).

9. Special Agent Estrada then contacted Special Agent Lipanovich to tell him that the DNA samples had been obtained, and she shipped them to him (Tr. at 28). In her FBI 302, Special Agent Estrada noted that defendant had been accompanied by an attorney (Tr. at 28).

10. A grand jury subpoena for work records was served on defendant on March 9, 2006, when the search warrant was executed (Tr. at 30-31, 66). On March 15, 2006, David Wahlberg wrote a letter to Special Agent Lipanovich stating that documents sought in a subpoena had been sent by overnight delivery, and that because he had received the subpoena just last week it was impossible for him to comply by March 14 (D. Ex. 3). The letter was faxed to Special Agent Lipanovich on March 15 (Tr. at 31). Therefore Special Agent Lipanovich was aware that Mr. Wahlberg was representing defendant as of March 15, 2006 (Tr. at 31).

11. On April 7, 2006, a letter was sent to Mr. Wahlberg with a proposed plea offer for defendant (Tr. at 7; D. Ex. 4). The letter stated that unless the defendant

6

accepted the plea offer by April 21, 2006, an indictment
would be sought once the grand jury convened (Tr. at 56; D.
Ex. 4). Mr. Wahlberg conveyed the information in the letter
and the plea offer to defendant (Tr. at 57, 70). Mr.
Wahlberg advised defendant to obtain some other attorney to
assist him if he was not going to retain Mr. Wahlberg (Tr.
at 70, 71).

12. On April 19, 2006, Mr. Wahlberg sent a letter to
Ms. Phillips stating that he had represented defendant only
for the very limited purpose of the search warrant and that
he was not defendant's attorney (Tr. at 8, 58, 68; D. Ex.
5). The letter stated that Mr. Wahlberg was not
representing defendant for any criminal proceeding in the
Western District of Missouri (Tr. at 68). He stated that if
defendant did retain Mr. Wahlberg, Mr. Wahlberg would notify
Ms. Phillips (Tr. at 68). He requested that she extend the
plea deadline or keep the plea offer open until such time as
defendant was able to retain counsel (Tr. at 58; D. Ex. 5).
Mr. Wahlberg stated that defendant was the son of an old
acquaintance of Mr. Wahlberg's mother, and therefore if Ms.
Phillips informed Mr. Wahlberg that an indictment had been
returned, he would, as a courtesy, inform defendant and
advise him to surrender (Tr. at 67; D. Ex. 5).

7

13. Had defendant been able to afford Mr. Wahlberg's services, he would have represented defendant in Missouri; however, through his discussions with defendant it appeared unlikely defendant would be able to afford to retain an attorney (Tr. at 58).

14. That same day, Ms. Phillips sent a letter to Mr. Wahlberg stating that the plea offer would not be extended, and defendant would be indicted when the next grand jury convened (Tr. at 59; D. Ex. 6).

15. At no time during his representation of defendant did Mr. Wahlberg give anyone permission to take a statement from defendant (Tr. at 58). However, Mr. Wahlberg did not consider himself in plea negotiations with the government because he had made it clear that he could not do such a thing (Tr. at 59). Mr. Wahlberg had to negotiate with Ms. Phillips to get a copy of the probable cause affidavit in support of the search warrant, and he received this after the search warrant had been executed (Tr. at 59). Mr. Wahlberg would never conduct plea negotiations without first reviewing full discovery and conducting his own investigation (Tr. at 59). Mr. Wahlberg at no time notified Ms. Phillips that he had been retained to represent

8

defendant in this criminal matter as he said he would do in
his letter if that occurred (Tr. at 68).

16.  Special Agent Lipanovich had a discussion with
AUSA Cynthia Phillips about defendant's no longer being
represented by an attorney (Tr. at 75-76, 80-82).  In Ms.
Phillips's opinion, it was OK for Special Agent Lipanovich
to talk to defendant since he was no longer represented by
counsel (Tr. at 76, 80-82).  Because defendant was no longer
represented by an attorney, Special Agent Lipanovich decided
to go to Austin, Texas, to attempt to interview defendant
(Tr. at 8).

17.  On April 25, 2006, Special Agent Lipanovich went
to Austin (Tr. at 9, 32).  He went to the ASH Gymnasium in
the Austin State Hospital where he believed defendant would
be holding wrestling practice (Tr. at 9).  He arrived about
a half hour before practice was over (Tr. at 9).  He walked
around the grounds for a while and waited outside until all
the parents and kids had departed (Tr. at 9).  Defendant
then came out and Special Agent Lipanovich approached him
and introduced himself as a special agent with the FBI (Tr.
at 9, 38).  He told defendant that he was working
defendant's case in Kansas City and wanted to give defendant
an opportunity to explain his side of the story (Tr. at 9).

He said if defendant wanted to talk, that was fine, if he did not want to talk, that was fine too (Tr. at 9).

18. This conversation occurred outside of the gymnasium near defendant's truck (Tr. at 9-10, 38). Special Agent Lipanovich was wearing cargo pants, and a shirt with a jacket over it (Tr. at 10, 40). He wore no clothing that identified him as an FBI agent, just the clothing he wore from the airport (Tr. at 40). Special Agent Lipanovich did not threaten to take defendant into custody, and he did not show defendant his gun (Tr. at 10).

19. Defendant said that he would welcome the opportunity to tell his side of the story (Tr. at 10). He said that he still needed to close up the gym (Tr. at 10-11). Special Agent Lipanovich said that was fine, they could talk inside and he could sit down and take notes, and defendant said that would be fine (Tr. at 10). They went inside, and there was a table, similar to a picnic table, 15 to 20 feet inside the door (Tr. at 10, 38, 39). Special Agent Lipanovich sat down at the table and asked defendant if he minded if Special Agent Lipanovich took notes, and defendant said that would be fine (Tr. at 11). Defendant then went to two different locations in the gym to put up some equipment while Special Agent Lipanovich sat at the

10

table and waited (Tr. at 11, 40).  When defendant came back
to the table, he sat across from Special Agent Lipanovich,
and he was on the side closest to the gym door (Tr. at 11).

20.  During much of the conversation, defendant talked
about wrestling, weight classifications, his wrestling
career, and things of that nature which Special Agent
Lipanovich did not consider relevant to the investigation
and did not put in his FBI 302 (Tr. at 12, 44).  During the
conversation, defendant got up and walked around while he
talked, he did not stay seated at the table (Tr. at 12).
Special Agent Lipanovich stayed seated the entire time so he
could lean on the table to take notes (Tr. at 12).

21.  Special Agent Lipanovich first got background
information such as date of birth, Social Security number
(Tr. at 12, 41).  He asked defendant where he was living,
and defendant gave a post office box address (Tr. at 12-13).
Special Agent Lipanovich asked where defendant was actually
living, and defendant said he did not know his address (Tr.
at 13).  Special Agent Lipanovich knew through investigation
that defendant lived with his sister at 9106 Georgian Drive
(Tr. at 13).  He asked defendant, "Don't you live with your
sister on Georgian Drive?" and defendant said he did live on
Georgian Drive but did not remember the house number (Tr. at

11

13). After Special Agent Lipanovich gave him the house number, defendant said he did not remember it because all of his mail went to his post office box (Tr. at 13).

22. Defendant said he had been involved with wrestling through high school, college, and beyond (Tr. at 13). Some of his students thought he looked like The Rock (a wrestler), so he named his wrestling club the Rock (Tr. at 13). He had owned and operated the Rock for about six years (Tr. at 13).

23. Special Agent Lipanovich asked defendant if he knew Child Victim Number 1 ("CV1") (although he used the girl's name), and defendant said he did not (Tr. at 14). Then he said, "Well, wait a minute. I don't want to say I don't know her because I've probably seen her at wrestling tournaments." (Tr. at 14). So he said he would know of her, but really did not know her until the three-day wrestling camp prior to traveling to North Dakota (Tr. at 14). He said he knew her better during the wrestling camp (Tr. at 14).

24. Special Agent Lipanovich then said, "Explain to me why this girl would hate you so much that she would supposedly make up this story about you?" (Tr. at 14). Defendant said that ever since he had heard the allegations,

12

he had been racking his brain and had come up with three reasons why this girl would make up false accusations against him (Tr. at 14-15).

25. First, during a training camp in Frisco, the girl injured her ankle and was not able to do some of the wrestling moves, running, and conditioning (Tr. at 15). Defendant recommended to her and the other coaches that she not go to the tournament in North Dakota, rather she should go home (Tr. at 15).

26. The second reason was that at the tournament he passed out t-shirts and this girl was the last to get a shirt (Tr. at 15). All he had left was extra large, and she is a slight-framed girl (Tr. at 15). She was upset that she got a t-shirt that was too large (Tr. at 15).

27. The third reason was that Team Texas won the championship, and there were 17 girls on that team (Tr. at 15-16). During the awards ceremony, he passed out the medals, but there were only 16 medals, and this girl was the last one in line and did not get a medal (Tr. at 16).

28. Special Agent Lipanovich then asked defendant if he could think of a reason why Child Victim Number 2 ("CV2") would also falsely accuse him (Tr. at 16). He thought CV1 and CV2 had gotten together, because he could think of no

13

reason why CV2 would make such an allegation on her own (Tr. at 16).

29. Special Agent Lipanovich then talked to defendant about the bus trip from Fargo to Texas (Tr. at 16). Defendant said he was seated in about the second row of the bus behind Coach Brown, and he was seated between CV1 and CV2 (Tr. at 17). The busses are traditionally cold, and he had passed the blankets out to the other wrestlers (Tr. at 17). He felt so bad about CV1 not getting the right t-shirt or a medal that he decided to get his sleeping bag down and he covered the three of them up with his sleeping bag because they were cold (Tr. at 17).

30. Special Agent Lipanovich specifically asked defendant about the girls' allegations (Tr. at 17). He asked defendant if he had felt CV1's breasts underneath her clothes or if he had penetrated her vagina with his finger, and defendant denied having done either (Tr. at 17). Special Agent Lipanovich asked defendant if he had placed his hand over the clothing of CV2's breasts or vaginal area, and again he denied doing that (Tr. at 17).

31. Special Agent Lipanovich then asked defendant to explain the presence of his DNA on CV1's shorts (Tr. at 18, 43). CV1 had told law enforcement that defendant had forced

14

CV1 to masturbate him to the point of ejaculation (Tr. at 18). After he let go of her hand, she went to the back of the bus where there is a restroom, and she wiped what she believed to be seminal fluid from her hand onto her shorts as she was walking to the back of the bus (Tr. at 18-19). Although the shorts had been sent to a lab, the results of the testing had not yet been obtained (Tr. at 19, 44).

32. Defendant told Special Agent Lipanovich that at one point during the bus ride, he was seated by himself with a pillow behind his back, and he was leaning against the outside of the bus (Tr. at 19). He was asleep, and he had covered himself up with his sleeping bag (Tr. at 19). At some point CV1 woke him up and asked to sit with him because she was cold (Tr. at 19). She sat down, he put his legs over her, and he threw the sleeping bag back (Tr. at 19-20).

33. Then defendant said to Special Agent Lipanovich, "No, wait a minute, that's not right. I tucked my legs onto the plastic divider between the two seats, and then I threw the sleeping bag back over us." He said they then went to sleep (Tr. at 20). Sometime later on, he woke up because he felt CV1's hand or hands on his penis (Tr. at 20). He said CV1 had put her hand up his shorts and had her hands on his bare penis (Tr. at 20). He did not know how long it had

15

been going on, but while he was asleep CV1 had been masturbating him (Tr. at 20). He said he grabbed her hands, told her to stop, and told her to go to the back of the bus (Tr. at 20).

34. Defendant said that CV2 had injured her neck during the tournament, and during the bus ride he gave her a neck rub using some ointment called Tiger Balm (Tr. at 21).

35. Special Agent Lipanovich asked defendant about Child Victim Number 3 ("CV3") and about an allegation from 2004 that had arisen with respect to this girl (Tr. at 21). Defendant said that during the training camp in 2004, he had injured his knee and CV3 had driven him to the emergency room (Tr. at 22). They did not get out of the emergency room until about 3:00 in the morning, and they were both exhausted so they checked into a hotel (Tr. at 22). He denied making any sexual advances toward her, and he said he had no idea why she would make such an allegation (Tr. at 22).

36. Defendant said that when the bus returned to Texas from Fargo, he was going to tell Coach Brown about CV1's unwanted sexual advances, but Mr. Brown was not in a "particularly social or hospitable mood" so defendant loaded up his wrestlers and headed back to Austin (Tr. at 22).

16

37.  At no time during this conversation between Special Agent Lipanovich and defendant did defendant indicate he wanted to end the conversation, and at no time did he mention an attorney (Tr. at 23).

38.  Special Agent Lipanovich went through his notes with defendant step by step, and defendant said "that's right" (Tr. at 23, 44, 45).  Special Agent Lipanovich then told defendant that his story was not believable, particularly the part about how his DNA got on CV1's shorts (Tr. at 23, 42).  Defendant then said maybe he needed to talk to an attorney (Tr. at 23).  Special Agent Lipanovich said that if defendant wanted to talk to an attorney, then they were done (Tr. at 24, 46).  Defendant said he thought he needed an attorney, so the interview ended (Tr. at 24, 42).

39.  At no time during this entire conversation did defendant mention Mr. Wahlberg (Tr. at 24).  At no time did defendant indicate he did not want to talk to Special Agent Lipanovich, until the end when he questioned whether he should get a lawyer (Tr. at 46).

40.  Special Agent Lipanovich got up from the table, thanked defendant for talking to him, and then they both walked out of the gym (Tr. at 24).  Defendant went to his

17

truck and Special Agent Lipanovich left in his rental car
(Tr. at 24).

41.   The next day, Special Agent Lipanovich interviewed
two additional female wrestlers (Tr. at 32).

42.   Special Agent Lipanovich never called Mr. Wahlberg
to say he would like to interview defendant because Mr.
Wahlberg had stated in his letter that he no longer
represented defendant (Tr. at 35).   Special Agent Lipanovich
interpreted the letter to mean defendant was no longer
represented, because the letter said, "This is to inform you
that Mr. Morris [sic] retained me solely with regard to the
search warrant.   I have not been retained to represent him
in any criminal proceeding in your jurisdiction." (Tr. at
36-37; D. Ex. 5).

### III. RIGHT TO COUNSEL

Defendant argues that Special Agent Lipanovich violated
defendant's Sixth Amendment right to counsel by questioning
him without an attorney after his right to counsel had
attached.   Defendant argues that his right to counsel had
attached and that the filing of an indictment was a "mere
formality" because a search warrant for defendant had been
obtained, the AUSA had advised defendant's attorney in
writing that criminal charges would be presented at the next

18

grand jury, and a plea offer had been extended by the government.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." In McNeil v. Wisconsin, 501 U.S. 171, 175 (1991), the Supreme Court explained when this right arises:

> The Sixth Amendment right [to counsel] . . . is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.

The Supreme Court held that a defendant's statements regarding offenses for which he had not been charged were admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses. Id. at 176.

In Texas v. Cobb, 534 U.S. 162 (2001), the defendant was charged with burglarizing a house where a woman and her baby had gone missing. The defendant was appointed an attorney and was released on bond. He later confessed to his father that he had murdered the woman and her baby, and the defendant's father reported that to police. The police obtained an arrest warrant, took defendant into custody, and

19

advised him of his <u>Miranda</u> rights.  He waived those rights and confessed to the murders.  He then challenged those statements as having been taken in violation of his right to counsel because he had already been appointed counsel on the burglary charge and the police did not obtain his attorney's permission to question him.  The Supreme Court held that because the defendant had not been formally charged with the murders, no right to counsel had attached.  This was even though he had been charged with the burglary which occurred at the same time as the murders.  The Supreme Court used the Blockburger test to determine whether the offenses were the same, and because burglary and murder are different offenses, the defendant had no right to counsel on the murder issue.

In <u>Doggett v. United States</u>, 505 U.S. 647, 664 n.2 (1992), the Supreme Court reiterated that no Sixth Amendment right to counsel attaches prior to formal charges:

> In this regard, it is instructive to compare the Sixth Amendment's speedy trial right to its right to counsel, which also applies only to an "accused."  The right to counsel, we have held, does not attach until "'at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"  <u>United States v. Gouveia</u>, 467 U.S. 180, 188 (1984) (quoting <u>Kirby v. Illinois</u>, 406 U.S. 682, 689 (1972) (plurality opinion)).  In other words, for purposes of the right to counsel, an "accused" must in

fact be accused of a crime; unlike the speedy trial
right, it does not attach upon arrest.  <u>See</u>, e.g.,
<u>Gouveia</u>, 467 U.S. at 189-190, <u>McNeil v. Wisconsin</u>, 501
U.S. 171, 175-176 (1991).

In <u>Moran v. Burbine</u>, 475 U.S. 417, 430 (1986), the

Supreme Court held that no right to counsel attaches when a

suspect obtains an attorney, rather the right attaches at

charging.

> [W]e find respondent's understanding of the Sixth
> Amendment both practically and theoretically unsound.
> As a practical matter, it makes little sense to say
> that the Sixth Amendment right to counsel attaches at
> different times depending on the fortuity of whether
> the suspect or his family happens to have retained
> counsel prior to interrogation.  More importantly, the
> suggestion that the existence of an attorney-client
> relationship itself triggers the protections of the
> Sixth Amendment misconceives the underlying purposes of
> the right to counsel.  The Sixth Amendment's intended
> function is not to wrap a protective cloak around the
> attorney-client relationship for its own sake any more
> than it is to protect a suspect from the consequences
> of his own candor.  Its purpose, rather, is to assure
> that in any "criminal prosecutio[n]," U.S. Const.,
> Amdt. 6, the accused shall not be left to his own
> devices in facing the "'prosecutorial forces of
> organized society.'"  <u>Maine v. Moulton</u>, 474 U.S. [159,]
> 170 [(1985)](quoting <u>Kirby v. Illinois</u>, 406 U.S. 682,
> 689 (1972)).  By its very terms, it becomes applicable
> only when the government's role shifts from
> investigation to accusation.  For it is only then that
> the assistance of one versed in the "intricacies . . .
> of law," <u>ibid</u>., is needed to assure that the
> prosecution's case encounters "the crucible of
> meaningful adversarial testing."  <u>United States v.</u>
> <u>Cronic</u>, 466 U.S. 648, 656 (1984).

In this case, it is clear that defendant's Sixth

Amendment right to counsel had not attached when Special

Agent Lipanovich questioned defendant.  Although defendant had retained David Wahlberg to represent him in connection with the very charge for which he is now under indictment, the fact remains that defendant had not been charged at that time.  The Sixth Amendment right to counsel did not attach at the time Mr. Wahlberg was retained; therefore, it makes little difference whether he was still acting as defendant's attorney at the time Special Agent Lipanovich traveled to Texas to question defendant.  Defendant was not charged with any offenses until June 6, 2006 -- well after the April 25, 2006, statement.

Whether the questioning of defendant without notifying Mr. Wahlberg is a violation of the Rules of Professional Responsibility or even professional courtesy is irrelevant to whether defendant's Sixth Amendment rights were violated; therefore, I will not address those issues here.

Because defendant's Sixth Amendment right to counsel had not attached at the time he was questioned by Special Agent Lipanovich, defendant's motion to suppress his statement on that ground should be denied.

## IV.  NEED FOR *MIRANDA* WARNINGS

Defendant argues that his statement must be suppressed because he was not advised of his Miranda rights.

Miranda v. Arizona, 384 U.S. 436 (1966), requires that a suspect be advised of (among other things) his right to remain silent and to have an attorney with him during questioning. Law enforcement officers are required to advised a suspect of his Miranda rights only if custodial interrogation takes place. Id. Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way. Id. at 429.

In determining whether a suspect is "in custody," courts examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a "reasonable person in the suspect's position would have understood his situation" to be one of custody. Berkemer v. McCarty, 468 U.S. 420, 442 (1984). The totality of the circumstances are considered. United States v. Carter, 884 F.2d 368 (8th Cir. 1989).

The Eighth Circuit has outlined six factors to be considered in determining whether a suspect is "in custody" for Miranda purposes:

> Whether the suspect was informed at the time of
> questioning that the questioning was voluntary, that
> the suspect was free to leave or request the officers
> to do so, or that the suspect was not under arrest;
> whether the suspect possessed unrestrained freedom of

23

movement during the interview; whether the suspect
initiated contact with authorities or voluntarily
acquiesced to official requests to respond to
questions; whether strong arm tactics or deceptive
stratagems were employed during questioning; whether
the atmosphere of the questioning was dominated by law
enforcement officers; and whether the suspect was
placed under arrest at the termination of the
questioning.

United States v. Czichray, 378 F.3d 822, 831 (8th Cir.
2004), cert. denied, 544 U.S. 1060 (2005). The affirmative
presence of one or more of the first three factors mitigates
the existence of custody at the time of the questioning.
United States v. McKinney, 88 F.3d 551, 554 (8th Cir. 1996).
The presence of one or more of the last three facts during
questioning will tend to support a finding of custody. Id.
A finding of custody does not, however, have to be supported
by all six factors. Id.

Applying the above factors to the facts of this case, I
find that defendant was not "in custody" for Miranda
purposes.

1. ADVICE GIVEN BY OFFICERS

The most obvious and effective means of demonstrating
that a suspect has not been taken into custody or otherwise
deprived of freedom of action is for the police to inform
the suspect that an arrest is not being made and that the
suspect may terminate the interview at will. Oregon v.

24

Mathiason, 429 U.S. 492, 495 (1977); Miranda v. Arizona, 384 U.S. at 444. Although failure to advise a suspect that he is free to leave may suggest restraint, the absence of a statement suggesting that a suspect is not free to leave suggests freedom of movement. United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991).

In this case, defendant was outside his gym when he encountered Special Agent Lipanovich. Special Agent Lipanovich stated that he wanted to give defendant an opportunity to explain his side of the story, that if defendant did not want to talk that was fine. Although Special Agent Lipanovich never specifically told defendant that he was free to leave and was not being arrested, he did tell him that he did not have to answer questions. There is no evidence that Special Agent Lipanovich suggested that defendant was in custody or that defendant believed he was in custody or was about to be taken into custody.[1] This factor supports a finding that defendant was not in custody.

---

[1]The fact that Special Agent Lipanovich granted defendant's request to put away some equipment and close up the gym first supports this finding.

25

## 2. *RESTRAINT*

The Supreme Court has held that a suspect is not in custody when he is permitted to move about unaccompanied. Beckwith v. United States, 425 U.S. 341, 343 (1976). In this case, defendant's freedom of movement was not restrained. He was not placed in handcuffs, he was allowed to walk around the gym before and during questioning, Special Agent Lipanovich did not indicate in any way that defendant was being arrested. This factor supports a finding that defendant was not in custody.

## 3. *VOLUNTARILY ACQUIESCING TO QUESTIONING*

The third factor is whether the interview was instigated by authorities or whether the suspect initiated contact or voluntarily acquiesced to official questions. Because the Court in Miranda was concerned with questioning initiated by law enforcement officers, custody is often found lacking where the suspect voluntarily acquiesced to questioning. See Leviston v. Black, 843 F.2d 302, 304 (8th Cir.) (no custody where suspect initiated inquiry by voluntarily speaking with investigators), cert. denied, 488 U.S. 865 (1988).

In this case, defendant voluntarily spoke with Special Agent Lipanovich. Special Agent Lipanovich stated that he

26

was there to give defendant an opportunity to tell his side
of the story if he wanted to; that he did not have to answer
questions; and that if he did not want to talk, that was OK.
Defendant said that he would welcome the opportunity to tell
his side of the story.  This factor supports a finding that
defendant was not in custody.

**4.    *TACTICS USED***

Because strong-arm tactics are more generally
associated with formal arrest than with an informal
encounter with police, the use of such tactics normally
supports a finding of custody.  <u>United States v. Griffin</u>,
922 F.2d 1343, 1351 (8th Cir. 1990).  In this case, there
was no evidence that any strong-arm tactics were used.

**5.    *DOMINATION OF INTERVIEW***

An interrogation which occurs in an atmosphere
dominated by the police is more likely to be viewed as
custodial than one which does not.  <u>Berkemer</u>, 468 U.S. at
438.  The question is whether the entire context of the
questioning, including such considerations as place and
length of the questioning, whether the police assume control
of the place of questioning, and whether they dictate the
course of conduct followed by the suspect or other persons

Case 5:06-cr-06010-SOW   Document 45   Filed 11/20/06   Page 27 of 30

present at the scene, demonstrates that the course of the investigation was police dominated. <u>United States v. Griffin</u>, 922 F.2d at 1352; <u>United States v. Longbehn</u>, 850 F.2d 450, 453 (8th Cir. 1988). When a suspect is not subject to any sort of police commands or dictations, custody is usually found lacking. <u>United States v. Jones</u>, 630 F.2d 613, 616 (8th Cir. 1980).

In this case, defendant was subject to no police commands or dictations. He encountered Special Agent Lipanovich in a public place, there was only one law enforcement officer present, the officer was wearing casual street clothes, and defendant was not given any commands or dictations by any law enforcement officer.

## 6. *WHETHER ARRESTED AT CONCLUSION OF INTERVIEW*

Defendant was not arrested after his statement.

## 7. *CONCLUSION*

The "in custody" requirement is not satisfied merely because the person interviewed is the focus of a criminal investigation. <u>Beckwith v. United States</u>, 425 U.S. 341 (1976). Defendant bears the burden of proving that he was in custody at the time the statements were made. <u>United States v. Davis</u>, 792 F.2d 1299, 1308 (5th Cir.), <u>cert</u>.

denied, 479 U.S. 964 (1986); United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984); United States v. Grissom, 825 F. Supp. 949, 954 (D. Kan. 1993). I find that defendant has failed to meet this burden. All of the factors discussed above support the conclusion that defendant was not in custody when he made his statement. Therefore, because defendant was not in custody, Miranda warnings were not required.

Defendant's motion to suppress his statement on the ground that he was not advised of his Miranda rights should be denied.

## V.    CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III and IV, I conclude that the statement made by defendant was made before his Sixth Amendment right to counsel had attached, and at a time when defendant was not in custody and was therefore not entitled to Miranda warnings.

Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress his statement.

29

Counsel are advised that, pursuant to 28 U.S.C. §
636(b)(1), each has ten days from the date of this report
and recommendation to file and serve specific objections.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 20, 2006